UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
  MICHAEL CAIN,                   :    **MEMORANDUM DECISION AND**
                                       :    **ORDER**
                     Plaintiff,     :
                                       :
      - against -             :   21-cv-3325 (BMC)
                                       :
                                     :
  UNITED MORTGAGE CORP., and    :
  EMMANUEL CATECHIS,         :
                                       :
                    Defendants.    :
------------------------------------------------------------ X

**COGAN**, District Judge.

      During plaintiff Michael Cain's one year of employment at United Mortgage Corporation ("UMC"), his manager, Emmanuel Catechis, called him by several offensive names.  One of those names was a racial slur.  Plaintiff, who is African American, recognized that this was an attempt at humor by Catechis and by the coworkers who followed Catechis's example.  But understandably, plaintiff didn't find it funny.  After roughly two weeks of name-calling, plaintiff stood up in front of his colleagues and Catechis and told them to stop.  They did.  Catechis terminated plaintiff about eight months later for poor attendance and poor productivity.

      Plaintiff brought this action under Title VII, 42 U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), and corresponding provisions of state law, contending that he was discriminated against and subjected to a hostile work environment, and that he was terminated because of his race, his age, and in retaliation for his protected complaint regarding race discrimination.  Defendants' motion for summary judgment is granted as to all claims relating to age discrimination, granted as to the retaliation claim, and denied as to the race-based discrimination and hostile work environment claims.

Invoking supplemental jurisdiction, plaintiff has also brought claims for violations of the notice, wage statement, time-of-payment, and anti-kickback provisions of the New York Labor Law ("NYLL"). In opposing defendants' motion for summary judgment, plaintiff seeks to amend to add additional claims under the Fair Labor Standards Act and NYLL for unpaid wages. Defendants' motion is granted as to the labor law claims for all but the anti-kickback claim, as defendants have not challenged that. Plaintiff's motion to amend is denied, as it is futile and much too late.

## BACKGROUND

Defendant UMC is a residential mortgage lender and loan servicer, licensed to do business in 44 states including New York. Defendant Catechis was the branch manager of UMC's branch in Astoria, Queens between 2015 and 2022. In that position, Catechis was responsible for all phases of loan production, as well as recruiting, training, and supervising all branch employees. He had the authority to hire, fire, and discipline employees, but under company policy, terminations had to be approved by UMC's Human Resources Manager, Patricia Taylor. Emails suggest that Catechis interviewed, or was at least slated to interview, plaintiff for his position.

UMC had two levels of employees involved in the mortgage origination end of its business: licensed mortgage loan officers and unlicensed sales assistants. This distinction was an outgrowth of the 2008 mortgage crisis and subsequent Dodd Frank Act, which mandated that henceforth, only licensed mortgage loan officers could originate residential mortgage loans. At UMC, unlicensed sales associates were paid an hourly rate and were not entitled to receive a percentage of any closed loan as commission; they could, however, obtain a small discretionary bonus for closed loans on which they assisted. By contrast, licensed mortgage loan officers

received a percentage of closed loans as commission, and thus were in a potentially more lucrative position than unlicensed sales assistants.

Plaintiff was hired as an unlicensed sales assistant in September 2017.  All documentation regarding plaintiff's employment with UMC supports that fact – his employment contract, his pay stubs, his wage notices and statements, and his time records.[1]  Indeed, it is undisputed that plaintiff did not have a license to originate mortgages, and plaintiff acknowledges that performing the duties of a licensed mortgage loan officer (principally, originating loans) would have been illegal.  Nevertheless, he contends that shortly after he was hired, he entered into an oral side agreement with Catechis where he would have the same duties and responsibilities as a licensed mortgage loan officer and receive 1% of the value of each loan on which he worked.

In February 2018, Catechis began referring to plaintiff and another coworker, Roy Ben-Zvi, by "nicknames."  For plaintiff, the nicknames included "Bozo the Clown" (plaintiff thinks because he was bald and, in deposition testimony, suggests that it was tangentially related to his age – "I never seen somebody 15 years old walking around with no hair on top"), "Old Man Cain," "My Cocaine," and "My N----r Cain."  For Ben-Zvi, the nicknames were "Roy Ben Dover" and "Jew Boy."  Although plaintiff understood that Catechis – and the coworkers who followed suit – intended this as workplace humor, plaintiff considered it disrespectful.  He had a conversation with Ben-Zvi in which Ben-Zvi said he understood they were joking and was not

---

[1] Although plaintiff testified at his deposition, with regard to his "Notice & Acknowledgement Of Pay Rate & Payday Under Section 195.1 – NYS Labor Law," that "I've never seen this document before in my life," the rest of the record conclusively contradicts that.  Not only is his signature on it, but he received the document to his personal email address and replied that he "forwarded the document[ ] back" as requested.  Further, his paystubs precisely match what the form provided, and he acknowledged never protesting the salary rate set forth in the form.  Plaintiff's conclusory allegation that he did not sign the "Notice & Acknowledgement" form is insufficient to create an issue of fact when defendants have offered documentary evidence proving the opposite.  See Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003).

troubled by the name calling.[2]  After "a couple of weeks," plaintiff made a "blanket statement" in response to the most egregious of the nicknames, "My N----r Cain": "I just stood up from my desk and I said, 'That's not funny.' ... Everybody laughed, but I didn't hear it no more."

Plaintiff never made any formal complaints of race or age discrimination during his employment, even though he was aware of the reporting line for such complaints as set forth in UMC's employee handbook.  Plaintiff testified that he told Ira Zimmerman, the owner of a prior company at which he worked and the person who he believed had de facto ownership of UMC, about Catechis's "disrespectful" behavior and use of the "n" word at Catechis's wedding. Zimmerman apparently said that was "Manny being Manny" and walked away.  Plaintiff also testified that he mentioned Catechis's behavior to Taylor, the Human Resources Manager, saying something to the effect of, "Why do you people let him get away with all this?"  But plaintiff did not tell Taylor about Catechis's or others' use of the "n" word towards him.  Plaintiff has submitted no evidence as to when his complaints to Zimmerman and Taylor took place.

On April 13, 2018, Taylor sent plaintiff an email stating that according to UMC's records, plaintiff had not worked 40 hours a week on average, as was required for full-time status.  The email advised him that two days hence, his status would be changed to part-time, which meant he would no longer be eligible for group benefits or paid time-off under UMC's plans.

On August 1, 2018, Catechis counseled plaintiff about his poor attendance and performance.  A month later, Catechis reviewed plaintiff's "pipeline" of loans and noted that he was not assisting on any active files.[3]  Catechis terminated plaintiff on October 15, 2018.  Taylor

---

[2] As plaintiff testified, Ben Zvi "accepted 'Jew Boy.'  He accepted that.  So to him, it's just another joke being made.  But I didn't look at it that way."

[3] Plaintiff purports to dispute this in defendants' Rule 56.1 statement, but it is confirmed by an email from Catechis to Taylor.  By contrast, plaintiff has not pointed to any evidence to contradict it, including any loans on which was

admonished Catechis for not clearing the termination through her, as UMC's policy required, but based on the time records, she did not attempt to rescind the termination.

Plaintiff's time records showed that he worked only 217 of the possible 265 workdays of his employment and, when he was terminated on October 15, had worked only 4 days that month. Plaintiff contends that he worked more than 217 days, and that to the extent his time records do not reflect that, it is because Catechis told him not to punch in anymore. Specifically, plaintiff testified that Catechis told him around April, "You come in every morning, all you do is punch in. ... I don't want you punching in anymore." Regardless of whether Catechis said that and, if so, what Catechis meant by it, plaintiff never told Taylor about this alleged direction from Catechis and never protested having been put on part-time status.

Plaintiff's amended complaint contains fifteen claims for relief against UMC and Catechis, covering the waterfront from hostile work environment, discrimination, and retaliation to wage violations, brought under 42 U.S.C. § 1981, Title VII, the ADEA, the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and the NYLL. Discovery having been completed, defendants are seeking summary judgment. Plaintiff seeks to amend to add additional claims under the Fair Labor Standards Act ("FLSA") and NYLL for unpaid wages and overtime.

---

working. In the absence of plaintiff's citation to evidence in the record, defendants' statement is deemed admitted. See Striker Sheet Metal II Corp. v. Harleysville Ins. Co. of New York, No. 16-cv-5916, 2018 WL 654445, at *5 (E.D.N.Y. Jan. 31, 2018) (collecting cases).

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

A party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "'[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita, 475 U.S. at 586-87); see also Scott, 344 F.3d at 287 ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). Indeed, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in [her] favor." Anderson, 477 U.S. at 256.

The Second Circuit has instructed district courts to be wary of granting summary judgment in employment discrimination cases where the employer's intent is at issue. See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). "[W]ritings

directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers," so "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Id. But "even in the fact-intensive context of discrimination cases," summary judgment may be appropriate. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). Accordingly, the function of the court on a motion for summary judgment in an employment discrimination case "is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995) (quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994)).

## II.    Race-Based Claims

### A.    Hostile Work Environment

Title VII defines a hostile work environment as one "permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). The plaintiff must show that "the complained of conduct: (1) is objectively severe or pervasive – that is, ... creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristics or protected activity." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks and citation omitted). "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and

humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'"  Id. (quoting Harris, 510 U.S. at 23).

There is no opprobrium more demeaning when used by a white manager in the workplace towards a black employee than the "n" word.  In this instance, Catechis, plaintiff's manager, repeatedly called plaintiff, "My N----r Cain"[4] and plaintiff's coworkers followed suit.  Although the Supreme Court has suggested that "[m]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII," Faragher v City of Boca Raton, 524 U.S. 775, 787 (1998) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)), the cases are rare when that particular epithet, used by a manager, is insufficient.  See Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2014) ("[P]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n[---e]r' by a supervisor in the presence of his subordinates."  (internal quotation marks and citations omitted).).

In the instant case, there are a few factors which marginally affect the hostile work environment calculus, because "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity[.]" Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citations omitted).  For one, although plaintiff certainly felt demeaned, he understood on his own accord and based on his conversations with Ben-Zvi that the name was used not for the purpose of demeaning him, but rather, as a badly misplaced effort to establish camaraderie.  In addition,

---

[4] Defendants made the astonishing assertion in their 56.1 statement that Catechis "did not have a nickname" for plaintiff, citing to Catechis's deposition, while ignoring plaintiff's repeated description of nicknames in his deposition.  Obviously plaintiff's version has to be taken as true for purposes of this motion.

plaintiff suffered through the sophomoric behavior for two weeks, rather than the term of his employment, and his colleagues stopped when he asked them to.

Notwithstanding, a reasonable jury could find that two weeks of such an obviously unacceptable appellation constitutes "a steady barrage of opprobrious racial comments" as opposed to "a few isolated incidents of racial enmity," id., and that an employee shouldn't have to ask to get it to stop. This business was not a loading dock where inappropriate language might be more common. This was a white-collar financial business with a Human Resources Department, in which the most basic kind of training arguably should have absolutely precluded any use of the "n" word, especially by a manager like Catechis.

I will therefore let a jury determine whether what happened to plaintiff was sufficiently "severe" or "pervasive" to constitute a hostile work environment.

Since I am allowing plaintiff's Title VII claim to proceed, his hostile work environment claims under the "more lenient" NYSHRL and NYCHRL standards may also proceed. See Wheeler v. Praxair Surface Techs., Inc., 694 F. Supp. 3d 432, 451 (S.D.N.Y. 2023).

### B. Discrimination

Plaintiff's racial discrimination claims under Title VII, § 1981, the NYSHRL, and the NYCHRL are analyzed under the familiar three-step burden shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Montgomery v. New York City Transit Auth., No. 17-cv-6522, 2019 WL 1258482, at *3 (S.D.N.Y. March 19, 2019), aff'd, 806 F. App'x 27 (2d Cir. 2020).

The plaintiff must first establish a *prima facie* case of discrimination. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If the plaintiff satisfies his *prima facie* case, there is an inference of discrimination which shifts the burden to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action. Id. at

253 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802-03).  If the defendant satisfies its burden, the burden shifts back to the plaintiff to raise a factual issue that the defendant's offered reasons were a pretext for discrimination, or that his *prima facie* case, even when considered against the defendant's evidence, is sufficiently compelling that a jury could reasonably find that he was discriminated against because of his class membership.  <u>See</u> <u>Bonaffini v. City Univ. of New York</u>, 751 F. Supp. 3d 67, 74 (E.D.N.Y. 2024).

In determining whether the plaintiff has met this burden, the court must take a "case-by-case" approach that weighs "'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case.'"  <u>James v. N.Y. Racing Ass'n</u>, 233 F.3d 149, 156 (2d Cir. 2000) (cleaned up) (quoting <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133, 148-49 (2000)).  "In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited ... discrimination occurred.'"  <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005) (quoting <u>James</u>, 233 F.3d at 156).

The following well-established four-factor test is used to determine whether there is a *prima facie* case of discrimination: (1) plaintiff must belong to a protected class; (2) plaintiff must have been qualified for the job; (3) plaintiff must have suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action must give rise to an inference of discrimination.  <u>See, e.g.</u>, <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).  In considering whether the plaintiff has made his *prima facie* showing, a court should consider only the plaintiff's proffered evidence, not the defendant's evidence in response to it.  <u>See</u> <u>id.</u>  Plaintiff's burden at this stage is *de minimis*.  <u>See</u> <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000).

10

Here, it is undisputed that plaintiff belongs to a protected class, was qualified for his job, and was subject to an adverse employment action when he was terminated on October 15, 2018. Defendants challenge only the fourth factor in plaintiff's *prima facie* case: whether the circumstances surrounding his termination give rise to an inference of discrimination.

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015). An inference of discrimination may also be supported by "showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group.'" Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (quoting Graham, 230 F.3d at 39).

Plaintiff relies on proof which he contends shows, or at least raises factual issues as to, an inference of discrimination with respect to his termination: (1) plaintiff was called "My N----r Cain" by Catechis and coworkers on repeated occasions; (2) plaintiff received lower quality "leads" than non-African American employees; (3) plaintiff's loan applicants were denied; (4) plaintiff's parking spot was taken away; (5) plaintiff was called other offensive nicknames, *i.e.*, "Cain and Abel" and "My Cocaine"; (6) plaintiff lost his group benefits and unemployment; and (7) plaintiff was fired by Catechis without Taylor's pre-approval, in violation of UMC policy.

Even though plaintiff's burden at the *prima facie* stage is *de minimis*, the Court will not factor in most of plaintiff's proffered evidence because it has no tie to race, particularly: that plaintiff's loan applicants were denied, that his parking spot was taken away, that he was called other offensive but non-racial nicknames, and that plaintiff was fired without Taylor's approval.

To be clear, plaintiff is not arguing that any of these were adverse acts resulting from racial animus; he is instead arguing that these are acts which show that his termination (*the* adverse act) was based in racial animus. They do not. Plaintiff acknowledged at his deposition that the removal of his parking spot had nothing to do with his race. Similarly, with the obvious exception of "My N----r Cain," the appellations by which Catechis and other employees referred to him, *i.e.*, "My Cocaine" and "Cain and Abel," were arguably infantile, but not race-based. Finally, even if it's true that plaintiff's loan applicants were denied, or that plaintiff lost his group benefits and unemployment, or that plaintiff's termination was in violation of UMC's policy (which is ultimately immaterial, since Taylor effectively ratified Catechis's decision to fire plaintiff), these misfortunes do not have racial connotations – at least, not any that plaintiff has identified.

In addition, although plaintiff's allegation about receiving lower quality leads than non-African American employees is explicitly race-based, it cannot support an inference of discrimination because plaintiff has pointed to no evidence that the leads he received were actually of lower quality. And even if he had, he has not shown that he was "similarly situated in all material respects" to Roy Ben-Zvi and Donny Chmela, "the individuals with whom [he] seeks to compare [himself]." See Mandell, 316 F.3d at 379. Ben-Zvi was a licensed sales manager and Chmela was a senior licensed loan officer – plaintiff was an unlicensed sales assistant, junior to both individuals.[5]

---

[5] Plaintiff relies on Jordan v. United Health Grp., Inc., 783 Fed. App'x 31, 33 (2d. Cir. 2019), for the proposition that "[t]o satisfy the 'all material respects' requirement, a plaintiff must show that similarly situated employees 'engaged in comparable conduct.'" He argues that he, Ben-Zvi, and Chmela engaged in "comparable conduct" with respect to their job duties and therefore were similarly situated. Plaintiff conveniently leaves out the rest of the sentence from Jordan, which makes clear that "comparable conduct" refers to actions warranting discipline (*e.g.*, absences, late arrivals), not to job duties.

The only suitable evidence plaintiff has offered that could give rise to an inference of discrimination is Catechis and other coworkers' use of "My N----r Cain." This is sufficient for plaintiff to meet his *de minimis* burden at the *prima facie* stage, particularly because Catechis was the one who fired plaintiff.

Defendants are just as easily able to rebut plaintiff's proffer at stage 2 of the McDonnell Douglas framework as plaintiff is able to satisfy his *prima facie* case at stage 1. Plaintiff's time and attendance records show that he missed 48 days of work in one year. He was counseled about his lack of productivity and it did not improve. And other than telling Catechis and his coworkers to stop referring to him with a racial slur, which they did, he never raised a complaint of racial discrimination to any member of management until after he was terminated.[6]

That brings us to step 3 of the McDonnell Douglas analysis, *i.e.*, whether plaintiff has raised an issue of fact as to whether his termination was pretextual, or whether a reasonable jury could find that racial discrimination was a motivating factor in his termination. Plaintiff's offering of pretext can be only Catechis's use of "My N----r Cain" and subsequent firing of plaintiff. Defendants describe that as a "stray remark," but it is not that. It was used repeatedly over a two-week period until plaintiff told Catechis and his fellow employees to stop. It is therefore at least some evidence of discriminatory intent.

This is pretty thin gruel on which to make out a discrimination claim. I am skeptical that it will be enough for a jury, especially since Catechis seems to be the person who hired plaintiff. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, it is

---

[6] See the discussion of plaintiff's claim to have had a conversation with a person named Ira Zimmerman in the "Retaliation" section of this decision, infra.

difficult to impute to [that employer] an invidious motivation that would be inconsistent with the decision to hire." (internal quotation marks and citation omitted).).  Nevertheless, this is a motion for summary judgment.  I cannot weigh the likelihood that the jury will credit plaintiff's story that he was fired because of Catechis's racial animus.[7]  Although recognizing the waste of resources this might cause through an unnecessary trial and the arguably unfair increase in settlement leverage that it gives plaintiff, the law compels me to grant plaintiff a jury trial on it.[8]

Before the NYSHRL's amendment in June 2019, employment discrimination claims under the NYSHRL were historically "analyzed identically to claims under Title VII" and § 1981, meaning that a plaintiff had to show that the action alleged to be adverse was materially so.  See Desiderio v. Hudson Techs., Inc., No. 22-cv-0541, 2025 WL 1285278, at *9 (S.D.N.Y. May 2, 2025) (internal quotation marks and citations omitted).  Although this amendment made clear that NYSHRL claims should be analyzed separately from, and more liberally than, federal race discrimination claims, "it is as of yet unclear whether these two standards are co-extensive, or whether the NYSHRL requires something in between federal and local law for discrimination claims."  Nezaj v. PS450 Bar & Rest., 719 F. Supp. 3d 318, 335 n.3 (S.D.N.Y. 2024) (citation omitted).  Courts have consistently recognized that the amended NYSHRL standard has, at least, "come closer" to the NYCHRL standard, under which a plaintiff must show that he was treated "less well" because of discriminatory intent.  See Desiderio, 2025 WL 1285278, at *9.

---

[7] Defendants vigorously argue that plaintiff cannot raise an issue of fact based solely on his own testimony (his affidavit on this motion and his deposition testimony).  Of course he can.  Their better argument would be that plaintiff's testimony is so conclusory that no reasonable jury could make a finding based upon it.  As to that, the question is close.  His testimony on the oral agreements gives no indication of when or why he consented to them. But even with that, I am constrained to allow a jury to decide issues pertaining to plaintiff's credibility.

[8] Defendants raise other challenges to some of the evidence plaintiff has submitted on this motion.  I need not rule on them at this point in light of my denial of summary judgment on the discrimination claim.

The Court need not decide exactly how the federal, state, and local standards differ, if at all: since it is allowing plaintiff's federal discrimination claims to proceed, it will allow plaintiff's state and local discrimination claims to proceed as well.

### C.    Retaliation

The <u>McDonnell-Douglas</u> burden-shifting framework applies also to retaliation claims brought pursuant to Title VII, the NYSHRL, and the NYCHRL.  <u>See</u> <u>Edelman v. NYU Langone Health Sys.</u>, 141 F.4th 28, 45 (2d Cir. 2025).  Thus, plaintiff must first make out a prima facie case of retaliation.  <u>Id.</u>  In the racial discrimination context, the plaintiff must demonstrate that (1) he engaged in protected activity; (2) the defendant was aware of that activity; (3) he was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse; and (4) there was a causal connection between the protected activity and the materially adverse action or actions.  <u>Id.</u> (citation omitted).  By contrast, under the NYSHRL and NYCHRL, a plaintiff "must demonstrate that [he] took an action opposing [his] employer's discrimination and that, as a result the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  <u>Edelman</u>, 141 F.4th at 45 (internal quotation marks and citation omitted).

The primary point of dispute on the instant motion is whether plaintiff engaged in protected activity.  He made no complaints of racial discrimination during his employment to either Catechis, Taylor,[9] or any other manager.  He also was aware of the reporting line for such complaints as it was set forth in UMC's employment manual, which he received and acknowledged before he started work, but he didn't use it.

---

[9] Again, the extent of what plaintiff complained to Taylor was, "Why do you people let [Catechis] get away with all this?"  Plaintiff did not mention the racist name-calling or any other racist behavior.

Instead, he claims that his protected activity consisted of a conversation that he had with an individual named Ira Zimmerman at Catechis's wedding.  Plaintiff gave two versions of that conversation at his deposition. Plaintiff's first version went like this:

Q: Did you ever go to H.R. about the nickname "my n[---e]r Cain"?

A: I went to Ira.

Q: When did you go to Ira?

A: This was at Manny's wedding.  I said, "Ira" – and my wife was with me.  I said, "Ira," you know – he said, "How's it going over there?"  I said, "There's issues over there."  I said, you know, "Manny's, like, very disrespectful."

Q: What were the words you used, "disrespectful"?

A: Yes, it's "very disrespectful."

Q: Did you elaborate on that?

A: **Ira said, "That's Manny being Manny," and he walked away.  So I never got a chance.  That wasn't the right environment.**

(Emphasis added).

Although plaintiff plainly testified that he "never got a chance" to say more, there was indeed more to come, thanks to a break in the deposition.  Following the break, he spontaneously interjected a "supplement" to his prior testimony.  The supplement was wholly non-responsive to the question he was asked (regarding whether plaintiff had reviewed the employee handbook) but it seems clear that plaintiff wanted to interject that, despite his earlier testimony, he had indeed relayed Catechis's use of the racial slur to Zimmerman:

Q: Let's go to the complaints.  Showing you Defendant's Exhibit again, the employee handbook.  If you look on page 4 of the handbook, which is United 000101, this is the United Mortgage policy against harassment.  Did there come a time where you reviewed this policy?

A: I mentioned to you that I did mention to individuals that I had – privy to about the situation.  I tried to speak to Ira about it.  And if I do recall, I did mention to Ira

16

about the fact that Manny addressed me as a "n[---e]r," that he said, "my n[---e]r." I didn't say that – I just said, "Do you know he addressed me as 'my n[---e]r'?"  So I did make that – and I did –

Q: So you're now saying, after we took a break, that when you spoke with Ira at Manny's wedding, you told Ira that Manny called you a "n[---e]r"?

A: I mentioned to Ira that inappropriate behavior, the guy called me "my n[---e]r Cain."  And so Ira – Manny being Manny.  I mean, because, like I said, I don't think – it was a joke to everyone, it was a joke.  It's a running joke all around the world, I guess.

Putting aside the "refreshing" of plaintiff's recollection by his attorney (or whatever source) during a deposition break (as we must on summary judgment, as it raises yet another credibility issue that would be appropriate only at trial), we are still left wondering how Zimmerman factors into plaintiff's theory of retaliation.  Zimmerman was apparently the owner of Precision Financial, a mortgage company at which plaintiff had worked several jobs prior to UMC.  Plaintiff claims he ran into Zimmerman at UMC's Melville office prior to starting his employment, but he apparently never saw Zimmerman at UMC again once he was actually employed.

There is no admissible evidence in the record as to what position Zimmerman held at UMC, if any.  Plaintiff's testimony suggests Zimmerman held no formal position.  As plaintiff understood it in giving another non-responsive answer:

Q: Other than your discussion with Ira, did you ever make any other complaints to United Mortgage?

A: I don't consider myself a rat, but Ira's company, Precision Financial, was closed down because of the fact that Ira was doing fake loans.  They were cutting and pasting, and they were using Wite-Out like it was snowing outside.  So the bank department closed down.  So he opened up this company, and people don't know that.  Ira – this is Ira's company.  I don't care what name is on it.  This is Ira's company and Ira's money.  And the reason his name is not on it is because the bank shut him down.  Guess who's name it's in? His daughter's.

Other than this hearsay testimony, there is no evidence that Zimmerman's daughter owns UMC, or that Zimmerman engaged in improprieties at his prior employment (not that it would matter), or that Zimmerman was a manager or had any legal or de facto role at UMC, let alone a role that would make it reasonable to complain of discrimination to him. Further, there is no evidence that Zimmerman had any knowledge of or role in plaintiff's termination. Plaintiff's testimony could be accurate and, even so, Zimmerman could be no more than a passive investor or shareholder who had no operational role at all in UMC.

Although § 1981 and Title VII encompass claims for retaliation based on oral complaints of racial discrimination, CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008), a complaint will not constitute protected activity unless it is sufficient to put the employer on notice that a complaint for racial discrimination is being made. That means that company management has to be reasonably aware of the complaint. See Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 64 (2d Cir. 1992). Racial discrimination complaints are subject to less formal requirements than those under the FLSA to give rise to a retaliation claim, but oral complaints of racial discrimination still must be "made to employers in a context that makes the assertion of rights plain." Greathouse v. JHS Sec. Inc., 784 F.3d 105, 115 (2d Cir. 2015). This simply reflects the fact that a company cannot take retaliatory action based on a complaint about which it doesn't know.

Plaintiff had a full and fair opportunity for discovery in this case. If, as plaintiff alleges, the sole protected activity supporting his retaliation claim is this alleged conversation with Zimmerman at Catechis's wedding (even the post-deposition break, augmented version), plaintiff was obliged to show that Zimmerman was a person to whom a human relations complaint could reasonably have been made, and that the circumstances were such that plaintiff reasonably

expected Zimmerman to pursue it.  But plaintiff has adduced no evidence that Zimmerman was in management or had any responsibility to convey the conversation to management or did convey the conversation to management.  And plaintiff could not reasonably expect Zimmerman to pursue his complaint, as Zimmerman responded only, "That's Manny being Manny," and walked away.  Indeed, even plaintiff acknowledged knowing that the wedding "wasn't the right environment," yet he never attempted to contact Zimmerman before or after the wedding.  Therefore, I cannot find that this wedding conversation constituted protected activity, especially since plaintiff knew that Taylor was in the appropriate reporting line yet didn't report the discriminatory remarks.

Even if plaintiff had established that he engaged in protected activity, the Court would have to reject his retaliation claim for lack of causation.  Surprisingly, neither party has offered any argument or evidence for or against causation.  Plaintiff presumably would have attempted to satisfy causation through temporal proximity between his complaint to Zimmerman and his termination.  However, plaintiff neglects to identify when that complaint occurred, much less whether that complaint occurred within three or four months of his termination, as would be necessary to establish causation based on temporal proximity alone.  See Gehlaut v. New York City Dep't of Educ., No. 24-cv-1741, 2025 WL 2586770, at *2 (2d Cir. Sept. 8, 2025).  And even if plaintiff could establish causation based on temporal proximity at the *prima facie* stage, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013).

The retaliation claims are therefore dismissed.

### III.    Age Discrimination Claims

There is virtually nothing in plaintiff's opposing memorandum to support his claims of age discrimination.  The preamble to his memorandum states that his claims "include, but are not limited to ... the Age Discrimination in Employment Act... ."   His second point heading is entitled "PLAINTIFF WAS DISCRIMINATED AGAINST BASED ON HIS RACE AND AGE."  The first subheading to that is "*Discrimination under §1981*"[10] and the second subheading is "*Discrimination Against Plaintiff Under Title VII and the NYS/CHRL*," but there is again no reference to the ADEA or age discrimination. The text of plaintiff's memorandum, whether under these points or elsewhere, does not mention the word "age" or the term "age discrimination" at any other point, neither to set forth the legal standard nor to reference a single fact in the record that would support such a claim.

In the absence of any argument about a claim of age discrimination, it is not surprising that I am unpersuaded.  All claims relating to age discrimination are therefore dismissed.[11]

### IV.    New York Labor Law Claims

Plaintiff's imprecise labor law claims appear to fall into two categories: claims that have been pled, and claims that plaintiff requests leave to add by amendment.  As to the first category, the only claims in the amended complaint are violations of: (1) NYLL § 191 (failure to make

---

[10] Section 1981 does include age discrimination.  See Saint Francis College v. Al-Khazraji, 481 U.S. 604 (1987).

[11] Plaintiff's counsel appears to have made it as difficult as possible to understand his arguments, both as to his age discrimination claims and his other claims.  He might have thought that including frequent footnotes citing to his Rule 56.1 statements would be enough to allow me to ferret out his "argument."  I attempted to engage in the one-man table tennis game plaintiff sent me on, shuttling between his brief and 56.1 statements.  However, I found that some of the 56.1 statements did not further cite to the record; some references to the record in the 56.1 statements were incomplete or non-sequiturs; and others were to inadmissible evidence.  Thus, plaintiff's proposed process required innumerable, circular trips from his memorandum of law to his 56.1 statement, to (sometimes) the evidentiary record, then back to his memorandum of law, often with useless results.  Counsel would do well to remember that "judges are not like pigs, hunting for truffles buried in the record."  Kane v. DeBlasio, 19 F.4th 152, 167 n.15 (2d Cir. 2021) (quoting United States v. Morton, 993 F.3d 198, 204 n.10 (3d Cir. 2021)).  In addition, plaintiff's memorandum of law had a table of contents, but no page numbers corresponding to the approximately 20 headings and subheadings in the memorandum.

timely payment); (2) NYLL § 195(1) (failure to provide wage notice upon hiring); (3) NYLL §195(3) (failure to provide wage statements with each paycheck); and (4) NYLL § 196-d (accepting kickbacks from wages).  My disposition of those claims is as follows:

- NYLL § 191.  Defendants argue that plaintiff was a clerical employee paid on a biweekly basis, which complies with the statute.  Plaintiff never cites § 191 or responds to defendants' argument, so defendants' motion is granted.

-  NYLL §§ 195(1), 195(3).  I have already noted above that despite plaintiff's conclusory denial, the documentary record demonstrates as a matter of law that plaintiff in fact received and signed off on these notices.  See n.1, supra. Nevertheless, I am unable to resolve those claims on the merits because, like the vast majority of district courts in this Circuit, I hold that plaintiff lacks Article III standing to pursue them under TransUnion v. Ramirez, 594 U.S. 413 (2021), as they address only informational injury.  See Deng v. Frequency Elecs., Inc., 640 F. Supp. 3d 255, 264-267 (E.D.N.Y. 2022).  Those claims are therefore dismissed without prejudice to recommencement in state court for lack of subject matter jurisdiction.

- NYLL § 196-d.  Defendants have not sought summary judgment on this claim, so it survives their motion.

In plaintiff's "motion" to amend – that is, a section in his opposing memorandum and not an actual motion – plaintiff seeks to add claims under the FLSA and NYLL for unpaid overtime and straight time wages.  The request is procedurally defective. Like the undersigned, the judge to whom this case was previously assigned required a premotion conference letter requesting leave to move to amend, and plaintiff never requested it.

To support these claims, plaintiff of course relies on the policy of "liberal amendment" under Rule 15.  He contends that he didn't know he had such claims until he received defendants' motion for summary judgment that included payroll records.  That is a fallacious assertion, and in the context of a motion to amend, unlike summary judgment, I can reject it as incredible.

Plaintiff first received the payroll records that allegedly caused his counsel's light bulb to turn on when defendants submitted them to the EEOC, nearly two years before he commenced

this action.  And that wasn't the only time.  Defendants took plaintiff's deposition more than a year before they moved for summary judgment, and they marked these records as exhibits at that deposition.  It is also not believable that a sophisticated player in the mortgage business like plaintiff – over 20 years – somehow "didn't know" he was being underpaid.  It is clear to me that what happened here is that when it came time for plaintiff's counsel to draft his response to the summary judgment motion, this idea of underpayment came to him like Athena springing from Zeus's head.

More importantly, the claims are without merit. As plaintiff describes it, the claims are based on an alleged discrepancy in the payroll records.  Looking at the time and payroll records, plaintiff sees a difference in time between the date he received his pay and the end date of the pay period.  But plaintiff was paid for those four days.  Pay was issued about four days after the end of the pay period; those four days were picked up on the next pay period.

Finally, it is far too late to add claims that would require the reopening of discovery now.  This case is going on five years old.  Discovery has been completed and the case is virtually trial-ready.  Moreover, even when he testified at deposition much closer in time to the events at issue than the present, his recollection was, to say the least, hazy.  And since so much of his case is based on alleged oral agreements, defendants at this point would be hard pressed to further refute it.

An afterthought that would reopen the case and that gives all indications of being without merit is not a basis to amend.

**CONCLUSION**

Defendants' motion for summary judgment is granted in part and denied in part as set forth above.  Plaintiff's motion to amend is denied.  By separate Order, this matter will be set down for trial.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
          October 14, 2025